UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

NDSL, INC.,

       Plaintiff,

v.

JASON PATNOUDE,

       Defendant.
_____/

Case No.  1:12-CV-1161

HON.  GORDON J. QUIST

**OPINION REGARDING PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff, NDSL, Inc., seeks a preliminary injunction to enjoin its former employee, Jason Patnoude, from competing with NDSL in violation of a non-compete and non-solicitation agreement.  On November 27, 2012, the Court held an evidentiary hearing on the motion.  For the reasons set both below, the Court will deny NDSL's motion.

**I.  BACKGROUND**

NDSL, Inc. is a North Carolina corporation with its principal place of business in Raleigh, North Carolina.  NDSL is in the business of selling battery monitoring technology.  On June 27, 2011, at the commencement of his employment with NDSL, Defendant, Jason Patnoude, signed a non-compete and non-solicitation contract (Agreement).  Patnoude worked for NDSL as a Regional Sales Manager for the Eastern United States.  In September 2012, Patnoude resigned from his position.  On October 8, 2012, Patnoude began working for IntelliBatt, LLC, as the Great Lakes Area Manager.  NDSL contends IntelliBatt is a competitor of NDSL and Patnoude's employment violates the Agreement.

Paragraph 7 of the Agreement provides in pertinent part,

Agreement Not to Disclose or Use Trade Secrets or Confidential Information. Employee agrees that during his or her employment with Employer and following termination of Employee's employment with Employer, whether such termination is by Employee or Employer for whatever reason, Employee will not (a) use any Trade Secrets or Confidential Information; or (b) reveal or disclose any Trade Secrets or Confidential information to any person, company, or entity outside Employer, except as expressly authorized in Employee's performance of his or her duties for Employer.

Paragraph 9 additionally states,

Non-competition and Non-solicitation.
- a. Employee agrees that for the duration of Employee's employment with Employer, and for a period of twelve (12) months after Employee's employment with Employer ends, Employee will NOT, within the Protected Area, do any of the following:
- (1) Engage directly or indirectly (either as an owner, employee, consultant, agent, or in any similar capacity) in the Restricted Business;
- (2) Solicit or encourage any Customers of Employer (a) with whom Employee had Direct Contact during any part of the last six (6) months of Employee's employment with Employer, and (b) who remain Customers of Employer at the time of the attempted solicitation, to become Customers of any new business entity with which Employee has become affiliated that conducts the Restricted Business;
- (3) Request, induce, or attempt to influence any Customer of Employer or supplier of goods or services to Employer to curtail or cancel any business it transacts with Employer;

* * *

- b. Protected Area. "Protected Area" shall mean the following:
- (1) The United States;
- (2) If the definition in subparagraph b(1) is found to be unreasonable with respect to subparagraphs a(1), a(2), a(3), a(4), or a(5) of this Section 9, then with regard to that subparagraph, the term "Protected Area" shall mean North Carolina.
- c. Restricted Business. "Restricted Business" shall mean (i) the business of developing and marketing Battery Monitoring Systems and related technology; and (ii) the business of developing and marketing other Battery Monitoring and related technology that Employer has developed or is marketing at the time of Employee's termination.
- d. Customers. "Customers" shall mean persons or entities (i) who purchase the services or products of Employer, and (ii) who purchased or used the services of Employer at some point in time during Employee's employment with Employer.
- e. Direct Contact. "Direct Contact" shall mean any communication related to the Restricted Business between Employee and a Customer in which the Employee and Customer exchanged information with each other.

## II.  ANALYSIS

A preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (internal quotations and alterations omitted). The decision whether to issue a preliminary injunction lies within the sound discretion of the district court. *See Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996). The United States Supreme Court and Sixth Circuit have noted that the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834 (1981); *Six Clinics Holding Corp. II v. Cafcomp Sys., Inc.*, 119 F.393, 400 (6th Cir. 1997).

When considering whether to grant the "extraordinary remedy" of a preliminary injunction, this Court will consider and balance four factors: (1) whether the plaintiff has a "strong likelihood of success on the merits," (2) whether the plaintiff will suffer irreparable injury in the absence of an injunction, (3) whether granting the injunction will cause substantial harm to others, and (4) whether the issuance of the injunction is in the public interest. *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003); *see also Blue Cross & Blue Shield Mut. of Ohio v. Columbia/HCA Healthcare Corp.*, 110 F.3d 318, 322 (6th Cir. 1997). These factors are not prerequisites that a plaintiff must establish at the outset, but interconnected considerations that the court must balance together. *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994). However, a plaintiff must demonstrate at least some irreparable harm before this Court will issue an injunction. *See Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 103–05 (6th Cir. 1982) ("Despite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required such irreparable harm before an interlocutory injunction may

be issued." *Id.* at 103.). In general, the likelihood of success on the merits that a plaintiff must prove is inversely related to the degree of injury the plaintiff will suffer absent an injunction. *Id.* at 105 (quotations omitted). Thus, even if a plaintiff fails to show a strong or substantial likelihood of success on the merits, a court may grant injunctive relief where the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Id.*

A.  **Likelihood of Success on the Merits**

The parties agree that North Carolina law applies to the breach of contract claim. *See Bueltel v. Lumber Mut. Ins. Co.*, 134 N.C. App. 626, 631, 518 S.E.2d 205, 209 (1999) (applying the law of the forum where the contract was made). North Carolina courts have long observed that covenants not to compete between an employer and employee are not viewed favorably under North Carolina law. *See, e.g.*, *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004); *Med. Staffing Network, Inc. v. Ridgeway*, 194 N.C. App. 649, 655, 670 S.E.2d 321, 327 (2009). "When considering the enforceability of a covenant not to compete, a court examines the reasonableness of its time and geographic restrictions, balancing the substantial right of the employee to work with that of the employer to protect its legitimate business interests." *Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 86, 638 S.E.2d 617, 618 (2007). "Under North Carolina law, a covenant not to compete is valid and enforceable if it is (1) in writing; (2) made part of the employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest of the employer." *Id.* at 88, 638 S.E.2d at 620.

In this case, the parties dispute the fourth and fifth elements—reasonableness as to time and territory and legitimate business interest.

4

1.  **Time and Territorial Reasonableness**

When considering the reasonableness of the time and territorial restrictions of a covenant not to compete, North Carolina courts look to six overlapping factors:

> (1) the area, or scope, of the restriction;
> (2) the area assigned to the employee;
> (3) the area where the employee actually worked or was subject to work;
> (4) the area in which the employer operated;
> (5) the nature of the business involved; and
> (6) the nature of the employee's duty and his knowledge of the employer's business operation.

*Id.* at 88, 638 S.E.2d at 620; *see also Hartman v. W.H. Odell & Assocs., Inc.*, 117 N.C. App. 307, 312, 450 S.E.2d 912, 917 (1994). A court will consider the time and territorial restrictions in tandem rather than independently. *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000). Thus, although either the time or the territory restriction, standing alone, may be reasonable, the combined effect of the two may be unreasonable. *Id.* "A longer period of time is acceptable where the geographic restriction is relatively small, and *vice versa*." *Id.* (emphasis in original). "'A restriction as to territory is reasonable only to the extent it protects the legitimate interests of the employer in maintaining [its] customers.'" *Hejl v. Hood, Hargett & Assocs., Inc.*, 196 N.C. App. 299, 306, 674 S.E.2d 425, 429 (2009) (quoting *Manpower, Inc. v. Hedgecock*, 42 N.C. App. 515, 523, 257 S.E.2d 109, 115 (1979)). "The territory embraced by [a non-competition] covenant shall be no greater than is reasonably necessary to secure the protection of the business or good will of the employer." *Id.* (internal quotations and alterations omitted). "'[T]o prove that a geographic restriction in a covenant not to compete is reasonable, an employer must first show where its customers are located and that the geographic scope of the covenant is necessary to maintain those customer relationships.'" *Id.* (quoting *Hartman*, 117 N.C. App. at 312, 450 S.E.2d at 917 ).

In the present case, the Agreement restricts Patnoude from undertaking various activities, set forth in subparagraphs 9.a(1)–(5). The Court will evaluate the reasonableness of the time and territory as applied to each subparagraph.[1]

    *a.    Subparagraph 9.a(1)*

Applying North Carolina law, the Court makes the following findings of fact and conclusions of law regarding subparagraph 9.a(1).

*Findings of Fact*

- The Agreement restricts Patnoude from "engag[ing] directly or indirectly (either as an owner, employee, consultant, agent, or any similar capacity) in the Restricted Business."

- Restricted Business is defined as the "business of developing and marketing Battery Monitoring Systems and related technology," or "developing and marketing other Battery Monitoring and related technology that Employer has developed or is marketing at the time of Employee's termination."[2] The contract does not define "Battery Monitoring Systems."

- The Protected Area is defined as either the United States, or if this Court finds that to be an unreasonable restriction, North Carolina.

- NDSL and IntelliBatt operate at different stages of the distribution process. NDSL sells battery monitoring systems through independent "channel partners," who then resell NDSL's products to end users, which can include manufacturers of uninterruptible power supply systems (UPS). Virtually none of NDSL's sales in the United States are made directly to end users.

- By contrast, IntelliBatt largely sells complete UPS systems, and to a lesser extent, UPS battery monitoring systems, to end users.

---

[1] Subparagraph 9.b(2) anticipates that a court would evaluate the reasonableness of the territorial scope of each subparagraph independently. ("If the definition of subparagraph b(1) is found to be unreasonable with respect to subparagraphs a(1), a(2), a(3), a(4), *or* a(5) of this Section 9, then with regard to that subparagraph, the term 'Protected Area' shall mean North Carolina.")

[2] Patnoude argued at the evidentiary hearing that the definition of Restricted Business, subparagraph 9.c, should be interpreted conjunctively. The Court rejects that argument. The items are separated by a semicolon and should be read like a dictionary definition with multiple entries, meaning that either definition independently triggers the Agreement's restrictions.

- IntelliBatt does not use channel partners. IntelliBatt is a direct competitor of NDSL's channel partners, but not a direct competitor of NDSL in the sale of battery monitoring systems.

- In his employment with IntelliBatt, Patnoude has and intends to continue to attempt to sell battery monitors apart from complete UPS systems.

- For NDSL, Patnoude had responsibility for a nineteen-state region, including Minnesota, Iowa, Missouri, Illinois, Wisconsin, Michigan, Indiana, Ohio, Kentucky, West Virginia, Pennsylvania, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, and Maine.

- For IntelliBatt, Patnoude is responsible for making sales to end users in six Great Lakes area states: Wisconsin, Illinois, Michigan, Indiana, Ohio, and Kentucky. Thus, Patnoude's IntelliBatt territory overlaps six states of his NDSL territory.

- Although Patnoude attended some trade shows on behalf of NDSL, there is no convincing evidence that he met anyone that would remember him or that he would be the specific object of the attention of any end user. Rather, NDSL's channel partner representatives were the object of an end user's attention because the channel partners were the entities that priced and resold NDSL's products to end users. That is, an end user would look to a channel partner for specifications, pricing, and satisfaction, and Patnoude played a supporting role to the channel partner. If an end user approached Patnoude, Patnoude's job was to connect the end user to a channel partner. If a potential end user visited NDSL's website, the website instructed the end user to contact one of NDSL's channel partners. Moreover, some channel partners did not reveal to NDSL the names and addresses of their end user customers - retaining that information for themselves.

- Patnoude did attend sales meetings with representatives of NDSL's channel partners and end users. He did not directly call on end users of NDSL's battery monitoring systems by himself.

- Patnoude did not participate in sales meetings with customers outside his territory. Although Patnoude participated in internal NDSL meetings with other NDSL regional sales representatives, there is no evidence that Patnoude had direct contact with end users in regions outside of his nineteen state territory.

- Patnoude never personally sold an NDSL battery monitor directly to an end user.

*Conclusions of Law*

- "Battery Monitoring Systems and related technology" means UPS battery monitors and their component parts, but does not extend to UPS systems without battery monitors. The Court interprets marketing to include sales.[3] Thus, subparagraph 9.a(1) prohibits Patnoude from selling battery monitoring systems and their component parts, including UPS systems that contain battery monitors.

- "Restricted Business" is not limited to sales to particular customers. As defined, the Restricted Business focuses on the type of industry, not the recipients of the products. Thus, subparagraph 9.a(1) is not limited to selling to battery monitors to NDSL's channel partners. It includes sales to NDSL's end users.

- Applying the six relevant factors, *Okuma*, 181 N.C. App. at 88, 638 S.E.2d at 620, to subparagraph 9.a(1), the territorial restriction of the entire United States is unreasonable and overbroad. First, NDSL has the burden to establish that its interest in maintaining its customer relationships justifies a nationwide scope. *Hejl*, 196 N.C. App. at 306, 674 S.E.2d at 429. Here, NDSL provided testimony about, and introduced a map showing, the distribution of NDSL's shipments throughout the United States. However, the locations to which the products were shipped does not correlate to the location of sales. Almost all shipments represent sales conducted by NDSL's channel partners—NDSL had no direct relationship or knowledge of the identity of some of those end users. Moreover, NDSL has not established that it has customer relationships in, or has made shipments to, every state. There are several states to which NDSL has not made any shipments. NDSL has provided no evidence that it has clients—or actively markets to or pursues potential clients—in every state. Thus, NDSL has failed to establish that the territorial restriction is no greater than is reasonably necessary to secure the protection of the business or goodwill of the employer. *See, e.g., id*; *Manpower*, 42 N.C. App. at 523, 257 S.E.2d. at 114. Second, a comparison of the region assigned to Patnoude and the scope of the restriction illustrates that the territorial restriction is unreasonable. Patnoude was responsible for only nineteen states, not sales throughout the United States. Although NDSL argues that Patnoude attended many trade shows at which end users from other regions were present, as the findings of fact illustrate, the degree of Patnoude's contact with users in other regions does not justify a nationwide restriction. Finally, viewing the time and territorial restrictions in tandem,

---

[3] Patnoude argues that "developing and marketing" does not include sales. (Def.'s Resp. to Emergency Mot. for TRO and Prelim. Inj., Docket no. 23, Page ID 164.) The Court disagrees. The Random House Dictionary defines "marketing" as "the act of buying or selling in a market." Thus, the Court interprets "marketing" as broad enough to encompass sales. *Random House Dictionary of the English Language* 1177 (2d ed. unabridged 1987).

although a one-year restriction standing alone is reasonable, *compare Precision Walls, Inc. v. Servie*, 152 N.C. App. 630, 638, 568 S.E.2d 267, 273 (2002) (finding a "one year time restriction is well within the established parameters for covenants not to compete") *with* Farr, 138 N.C. App. at 283, 530 S.E.2d at 883 (finding a five-year restriction is the outer boundary), it does not justify a nationwide scope that is wider than necessary to protect NDSL's customer relationships.

- The default scope of North Carolina[4] is irrelevant as to Patnoude because he never sold battery monitors in North Carolina and there is no indication that he intends to do so.

- NDSL has not demonstrated a *strong likelihood of success on the merits* of this argument.

### b. Subparagraph 9.a(2)

The Court makes the following findings of fact and conclusions of law with respect to subparagraph 9.a(2).

### Findings of Fact

- Subparagraph 9.a(2) restricts Patnoude from "solicit[ing] or engag[ing] any Customers of Employer (a) with whom Employee had Direct Contact during any part of the last six (6) months of Employee's employment with Employer, and (b) who remain Customers of Employer at the time of the attempted solicitation, to become Customers of any new business entity with which Employee has become affiliated that conducts the Restricted Business." Customers are defined as "persons or entities (i) who purchase the services or products of Employer, and (ii) who purchased or used the services of Employer at some point in time during Employee's employment with Employer." Direct Contact is defined as "any communication related to the Restricted Business between Employee and a Customer in which the Employee and Customer exchanged information with each other."

- In his sales role with IntelliBatt, Patnoude solicits end users in six Great Lakes Region states to buy IntelliBatt's products, which sometimes includes battery monitors.

---

[4] Unless an overbroad provision is distinctly separable from the rest of the contract, North Carolina law does not allow a North Carolina court to rewrite or "blue pencil" a contract. *See, e.g., Hartman*, 117 N.C. App. at 317, 450 S.E.2d at 920; *VisionAIR*, 167 N.C. App. at 508, 606 S.E.2d. at 362. Instead, a court will simply not enforce the contract. *Hartman*, 117 N.C. App. at 317, 450 S.E.2d at 920; *VisionAIR*, 167 N.C. App. at 508, 606 S.E.2d. at 362. In this case, however, subparagraph 9.b(2) provides for an alternative territorial restriction.

- On November 12, 2012, Patnoude contacted an employee of an NDSL channel partner via LinkedIn, a professional networking website, by sending a standard electronic invitation request ("I'd like to add you to my professional network on LinkedIn"). NDSL has not established that Patnoude and the employee had any additional conversations or exchanged information about IntelliBatt's products or services. Patnoude sent the message to the recipient as part of a mass invitation to over 500 people. In addition, it is quite unlikely that an NDSL partner, as opposed to an end user, would purchase a battery monitoring system from IntelliBatt.

*Conclusions of Law*

- The definition of Customer should be read conjunctively. Unlike the definition of Restricted Business, which divides the definitions of Restricted Business with a semicolon, the two subdivisions of Customer are separated by a comma (similar to subparagraph 9.a(2)). To read the definition disjunctively would lead to surplusage: Customer would mean persons or entities who purchased the services or products of NDSL, and would independently mean persons or entities who purchased or used services of Employer at some point in time during Employee's employment. As written, the second subdivision must be read to limit the Customers who purchased services from NDSL to those who purchased during Patnoude's employment. Read conjunctively, Patnoude may not solicit the business of NDSL's Customers who purchased Employer's products or purchased NDSL's *services during Employee's employment*.

- The term Customer is not limited to NDSL's channel partners. As written, the Agreement does not limit the definition of Customer to channel partners who purchased NDSL's products directly from NDSL. The definition focuses on the products or services purchased, not the relationship between the entities. Thus, the Court interprets the term Customer broadly to represent both channel partners and end users of NDSL's products.

- Subparagraph 9.a(2) shall be read conjunctively, limiting the solicitation restriction to Customers with whom Patnoude had Direct Contact during the final six months of his employment with NDSL and who remain Customers.

- As written, subparagraph 9.a(2) is not unreasonably broad as to time and territory. As previously discussed, a one-year time restriction is reasonable. A nationwide scope with respect to channel partner Customers and end user Customers with whom Patnoude had Direct Contact does not suffer from the same territorial problems as subparagraph 9.a(1). This section is not as burdensome for Patnoude because it only restricts Patnoude from

10

soliciting known Customers, rather than prohibiting Patnoude from engaging in his profession.

- Therefore, the Agreement prohibits Patnoude from soliciting NDSL's channel partner Customers or end user Customers with whom Patnoude had Direct Contact during the last six months of his employment with NDSL, anywhere in the United States.

- Patnoude's November 12, 2012, generic LinkedIn invitation is not sufficient to establish that Patnoude has solicited NDSL Customers in violation of subparagraph 9.a(2). NDSL has not established that Patnoude has solicited any NDSL Customer.

- Nor has NDSL established that Patnoude had "Direct Contact" with the recipient of the email as "Direct Contact" is defined in paragraph 9.e - i.e., there was no "exchange of information."

- NDSL has not demonstrated a *strong likelihood of success on the merits* with respect to this argument.

   c.   **Subparagraph 9.a(3)**

Regarding subparagraph 9.a(3), the Court makes the following findings of fact and conclusions of law.

*Findings of Fact*

- Subparagraph 9.a(3) restricts Patnoude from "request[ing], induc[ing] or attempt[ing] to influence any Customer of Employer or supplier of goods or services to Employer to curtail or cancel any business it transacts with Employer."

*Conclusions of Law*

- Applying the six relevant factors, *Okuma*, 181 N.C. App. at 88, 638 S.E.2d at 620, to subparagraph 9.a(3), the territorial restriction is overbroad because it is not limited to solicitation of Customers with whom Patnoude had Direct Contact, or to Patnoude's sales region. In fact, given the Agreement's broad definition of Customers, subparagraph 9.a(3) restricts Patnoude from soliciting persons or entities that Patnoude is *unaware* are Customers of NDSL products or services.

11

- The Court therefore applies to subparagraph 9.a(3) the default territorial restriction of North Carolina.[5]

- NDSL has not established that Patnoude has requested, induced, or attempted to influence any NDSL Customer or supplier, in North Carolina or otherwise.

- Given that Patnoude now works for IntelliBatt in a six-state Great Lakes region, not including North Carolina, NDSL has not demonstrated a *strong likelihood of success on the merits* with respect to this argument.

### d. Paragraph 7

Finally, regarding Paragraph 7, the Court makes the following findings of fact and conclusions of law.

*Findings of Fact*

- Paragraph 7 prohibits Patnoude from "(a) us[ing] any Trade Secrets or Confidential Information; or (b) reveal[ing] or disclos[ing] any Trade Secrets or Confidential Information to any person, company, or entity outside Employer ..."

- Subparagraph 7(a) defines Trade Secrets as "all techniques, methods of doing business and procedures used by Employer in its business which are not generally known or used in the industry; lists of Employer's current and prospective customers and associated customer information; computer hardware and software algorithms developed by Employer and related technology; and any other information or data which meets the definition of trade secrets under the North Carolina Trade Secrets Act."

- Subparagraph 7(b) defines Confidential Information as "data or information which is of value to Employer and not generally known to persons or entities outside of Employer." The Agreement provides the following non-exhaustive examples: "(i) customer lists and information about Employer's customers; (ii) personal information about other employees of Employer; (iii) financial and business records and information of Employer; and (iv) information regarding business opportunities for new or developing business and marketing plans and strategies of Employer."

---

[5] See note 4 regarding North Carolina's "blue penciling" doctrine.

- Patnoude did gain a general acquaintance with NDSL's technology, but he was not qualified by education or experience to enable him to develop or fully describe how others developed the technology. For example, Patnoude has no knowledge or understanding of the algorithms behind NDSL's technology. Patnoude's role at NDSL was to assist NDSL's channel partners with securing sales and technical support. In other words, he knew what a user should expect of the equipment and could give channel partners and end users information on how the technology was supposed to work, but could not develop the technology himself. There was no evidence of information regarding other employees of NDSL, "customer lists," or "related technology."

*Conclusions of Law*

- Paragraph 7 is reasonable on its face.

- NDSL has not established that Patnoude has disclosed any Trade Secrets or Confidential Information.

- NDSL argues that Patnoude will inevitably disclose Trade Secrets or Confidential Information due to the similar nature of his positions at NDSL and IntelliBatt. However, as the above findings of fact reveal, Patnoude's new responsibilities do not directly overlap with his duties for NDSL.

- The Court notes that North Carolina courts do not recognize the doctrine of inevitable disclosure in the context of non-compete agreements. The North Carolina Court of Appeals has previously considered whether to adopt the doctrine as North Carolina law, but held that it did not need to decide whether to adopt the doctrine because "it would not be applied in the fashion promoted by [the plaintiff]." *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 470, 579 S.E.2d 449, 455 (2003). The court explained, "the doctrine applies when an employee who knows trade secrets of his employer leaves that employer for a competitor and, *because of the similarity of the employee's work* for the two companies, it is 'inevitable' that he will use or disclose trade secrets of the first employer." *Id.* at n.3 (emphasis added). By contrast, the court explained, the plaintiff sought to use the doctrine as "an absolute barrier" to working in the specific industry, without regard to the process used to produce the product, which impacts the relevance of the trade secrets or other information for which protection was sought. It concluded, "if the doctrine is applied as urged by [the plaintiff], then no employee could ever work for its former employer's competitor on the theory that disclosure of confidential information is 'inevitable.'" *Id.* In fact, if the plaintiff had succeeded, the court noted that the defendant would not have been able to market his

    expertise at all. *Id.* at 471, 579 S.E.2d at 455. *Analog* thus indicates that North Carolina has not adopted the doctrine of inevitable disclosure. The Court has found no more recent case evidencing that North Carolina has since adopted the doctrine, and NDSL identifies none.

- The Court also notes that, under North Carolina law, customer names and customer lists are not always protected information. *See Combs & Assocs., Inc. v. Kennedy*, 147 N.C. App. 362, 369–70, 555 S.E.2d 634, 640 (2001) (concluding that a customer database was not protected as a trade secret because defendants could have compiled a similar database through publicly available information, such as trade show and seminar attendance lists); *Novacare Orthotics & Prosthetics East, Inc. v. Speelman*, 137 N.C. App. 471, 478, 528 S.E.2d 918, 922 (2000) (finding a list of customer names and addresses was not a trade secret).

- NDSL has not met its burden to demonstrate a *strong likelihood of success on the merits* on this argument for breach of contract because NDSL has failed to identify what specific information Patnoude has disclosed or is likely to disclose and how Patnoude, in his current position, has used or is likely to use it.

- If, however, in the future, NDSL has specific reason to believe Patnoude has disclosed a specific Trade Secret or Confidential Information, NDSL may file a new motion for an injunction.

    **2.    Legitimate Business Interest**

    In addition to the time and territorial scope, Patnoude argues that subparagraph 9.a(1) is too broad because it is wider than necessary to protect NDSL's legitimate business interest. Specifically, Patnoude argues that the definition of Restricted Business is unnecessarily broad because it restricts Patnoude from engaging in the Restricted Business in any capacity, not just as a salesperson.

    "To be valid, the restrictions on the employee's future employability by others 'must be no wider in scope than is necessary to protect the business of the employer.'" *VisionAIR*, 167 N.C. App. at 508, 606 S.E.2d at 362 (quoting *Manpower*, 42 N.C. App. at 521, 257 S.E.2d at 114 (1979)). If a non-compete agreement is too broad to be a reasonable protection to the employer's business, it

14

will not be enforced. *Id.* In *VisionAIR*, a court refused to enforce a restriction that encompassed "even wholly unrelated work" at a similar firm. 167 N.C. App. at 508–09, 606 S.E.2d at 362. In its analysis, the court distinguished between restrictions for "identical positions" at competitors and those involving different types of work for competitors. *Id.* & n.1. Similarly, in *Hartman*, a court held that an employee could not be prohibited from working in an unrelated capacity for another business in the same field. 117 N.C. App. at 317; 450 S.E.2d at 919–20 (a non-compete agreement is "overly broad in that, rather than attempting to prevent plaintiff from competing for [] business, it requires plaintiff to have no association whatsoever with any business that provides [similar] services .... Such a covenant would appear to prevent plaintiff from working as a custodian for any entity providing such services.").

In the present case, Patnoude has a colorable argument that the agreement is overbroad because it restricts Patnoude from working in the Restricted Business in almost any capacity, directly or indirectly. Although subparagraph 9.a(1) specifically limits its application to directly or indirectly engaging as "an owner, employee, consultant, agent, or in any similar capacity," the language is similar to the employment agreement the court refused to enforce in *VisionAIR*, 167 N.C. App. at 508–09 & n.1, 606 S.E.2d at 362–63.[6] The language restricts Patnoude from working within the Restricted Business in any capacity, including as a custodian for IntelliBatt. *Cf. Hartman*, 117 N.C. App. at 317, 450 S.E.2d at 920. Thus, taken together with the territorial unreasonableness, NDSL has not established a strong likelihood of success on its breach of contract claim relating to subparagraph 9.a(1).

---

[6] As the court noted in *VisionAIR*, in *Precision Walls*, 152 N.C. App. 630; 568 S.E.2d 267, the court held that a non-compete covenant may restrict an employee from "employment of any kind" by a direct competitor. *Id.* at 639, 568 S.E.2d at 273. However, the broad language is dicta because the *Precision Walls* court actually held that the defendant was prohibited from working in an *identical position* within a competing business. The Court finds the facts of *VisionAIR* more applicable to the present facts.

\* \* \*

In summary, in a motion for a preliminary injunction, NDSL has the burden of showing a "strong or substantial likelihood of success on the merits" or "at least .. serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction was issued." *Friendship*, 679 F.2d at 105. Here, NDSL has not established a strong or substantial likelihood of success on the merits for any of its breach of contract claims. Therefore, this factor weighs against issuance of an injunction.

### B.  Irreparable Harm

When deciding whether to issue an injunction, the Court next considers whether NDSL will suffer irreparable injury in the absence of an injunction. The Supreme Court has emphasized that a plaintiff seeking injunctive relief must do more than show that irreparable harm is merely possible. Rather, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 375 (2008) (emphasis in original). In gauging irreparable harm, courts consider three factors: (1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the moving party's proof. *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) (citing *Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987)). "When courts consider irreparable harm, [t]he key word . . . is irreparable, and [t]he possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against [the] claim." *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 32 (6th Cir. 2011) (internal quotations omitted).

It is well settled in the Sixth Circuit that "[a]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate."

16

*Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Id.* at 512; *see also Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001). Similarly, the loss of fair competition resulting from the breach of a non-competition covenant is likely to irreparably harm an employer. *Basicomputer*, 973 F.2d at 512 (citing *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991).

Looking to the substantiality of the injury alleged, the likelihood of its occurrence, and the adequacy of NDSL's proof, *Mich. Coal.*, 945 F.3d at 154, the Court finds that this factor weighs against issuance of an injunction. NDSL argues that Patnoude's knowledge of NDSL's pricing structure and profit margin for various products will lead to unfair competition and loss of customer goodwill. Beyond that, NDSL has failed to identify Trade Secrets or Confidential Information that Patnoude has disclosed or is likely to disclose and how it will harm NDSL. Irreparable harm may be possible at some point in time, but NDSL has not established that the injury is *likely*. Moreover, in light of the evidence presented, the Court finds this case distinguishable from cases in which irreparable harm can be inferred based on the similarity of a defendant's work for a competitor. Patnoude works for IntelliBatt in a different region, and sells products to end users instead of channel partners, which channel partners are essentially dependent upon NDSL. As such, the degree of applicability of Patnoude's knowledge to his new position is limited. This factor weighs against issuing an injunction.

### C. Substantial Harm to Others

In determining whether to grant NDSL's motion, the Court next considers whether issuing an injunction poses a risk of substantial harm to others. An inquiry into whether there will be substantial harm to others is a fact-based inquiry. *Curtis 1000, Inc. v. Martin*, 197 Fed. App'x 412,

426 (6th Cir. 2006). This analysis extends to harm to a defendant. *See, e.g.*, *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002).

In this case, NDSL seeks to enjoin Patnoude from any employment with IntelliBatt or otherwise engaging in the Restricted Business. A preliminary injunction would result in Patnoude's loss of his sole income and preclude him from working within his field of expertise. However, because Patnoude knowingly entered into the non-compete Agreement and elected to leave his employment with NDSL to pursue his current position with IntelliBatt despite his knowledge of the Agreement, the Court finds that this factor does not weigh heavily in favor of either granting or denying the motion.

### D. Public Interest

Finally, in determining whether to grant an injunction, the Court considers whether the public has an interest in the issuance of an injunction. Here, there are competing public interests. NDSL has a legitimate interest in developing and maintaining its customer relationships and being able to entrust its employees with confidential and proprietary information without fear that its competitors will unfairly gain access to such information. *See Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 691, 228 S.E.2d 478, 483 (1976), *superceded by statute on other grounds as stated by Eli Research, Inc. v. United Commc'ns Grp., LLC*, 312 F. Supp. 2d 748, 758 (M.D.N.C. 2004). On the other hand, an employee must have the "freedom to sell skills fairly and honestly acquired to the highest bidder ... [t]his reflects a commitment to market efficiency, but more importantly to personal freedom in choosing one's employment." *Id.* at 692, 228 S.E.2d at 483. The public also has an interest in the enforcement of legitimate contracts. However, the public interest in the enforcement of broad covenants not to compete is less certain, especially since North Carolina courts have long observed that non-compete covenants are not viewed favorably in North Carolina.

18

*See, e.g.*, *VisionAIR*, 167 N.C. App. at 508, 606 S.E.2d at 362; *Med. Staffing Network*, 194 N.C. App. at 655, 670 S.E.2d at 327. Finally, the public has an interest in fair and robust competition in the marketplace. Thus, this factor does not weigh heavily in favor of either granting or denying NDSL's motion.

### III. CONCLUSION

On balance, NDSL has failed to establish that it has a strong likelihood of success on the merits for any of its breach of contract arguments. Even if the Court were to find that NDSL has raised "serious questions going to the merits," *Friendship Materials*, 679 F.2d at 105, NDSL has not demonstrated that irreparable harm to NDSL is *likely* to result from Patnoude's employment with IntelliBatt and that the harm "decidedly outweighs any potential harm to the defendant" were an injunction issued, *id.* The final two factors, substantial harm to others and public interest, do not weigh heavily in favor of either granting or denying NDSL's motion. Therefore, a balance of the factors weighs against issuance of an injunction.

For the foregoing reasons, the Court will deny NDSL's Motion for a Preliminary Injunction.

An Order consistent with this Opinion will be entered.


Dated: December 7, 2012                                /s/ Gordon J. Quist
                                                                GORDON J. QUIST
                                                         UNITED STATES DISTRICT JUDGE

19